**BARK, Plaintiff,**

v.

**BUREAU OF LAND MANAGEMENT, Defendant.**

No. 3:12–cv–01656–AC.

United States District Court,
D. Oregon.

Feb. 19, 2014.

---

Brenna B. Bell, Bark, Portland, OR, for Plaintiff.

Brian M. Collins, U.S. Department of Justice, Washington, DC, for Defendant.

## ORDER

BROWN, District Judge.

Magistrate Judge John V. Acosta issued Findings and Recommendation (# 53) on

December 18, 2013, in which he recommends the Court deny Plaintiff's Motion (# 18) for Summary Judgment, grant Defendant's Cross–Motion (# 30) for Summary Judgment, and enter a judgment dismissing this matter with prejudice. Plaintiff filed timely Objections to the Findings and Recommendation The matter is now before this Court pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b).

When any party objects to any portion of the Magistrate Judge's Findings and Recommendation, the district court must make a *de novo* determination of that portion of the Magistrate Judge's report. 28 U.S.C. § 636(b)(1). *See also Dawson v. Marshall,* 561 F.3d 930, 932 (9th Cir.2009); *United States v. Reyna–Tapia,* 328 F.3d 1114, 1121 (9th Cir.2003) (*en banc* ).

In Plaintiff's Objections Plaintiff reiterates the arguments contained in Plaintiff's Memorandum in Support of Plaintiff's Motion for Summary Judgment, Response in Opposition (to Defendant's Cross–Motion for Summary Judgment) and Reply in Support of Plaintiff's Motion for Summary Judgment, and stated at oral argument. This Court has carefully considered Plaintiff's Objections and concludes they do not provide a basis to modify the Findings and Recommendation.

The Court also has reviewed the pertinent portions of the record *de novo* and does not find any error in the Magistrate Judge's Findings and Recommendation.

## CONCLUSION

The Court **ADOPTS** Magistrate Judge Acosta's Findings and Recommendation (# 53), **DENIES** Plaintiff's Motion (# 18) for Summary Judgment, **GRANTS** Defendant's Cross–Motion (# 30) for Summary Judgment, and **DISMISSES** this matter **with prejudice.**

IT IS SO ORDERED.

## FINDINGS AND RECOMMENDATION

ACOSTA, United States Magistrate Judge:

### Introduction

Plaintiff Bark ("Bark") filed this action against the Bureau of Land Management ("BLM") challenging BLM's decision to approve the Airstrip Timber Sale which allows the commercial thinning of just over 200 acres of BLM forest located in Clackamas County, Oregon (the "Sale"). Bark alleges BLM failed to follow the guidelines of the Salem Resource Management Plan adopted by BLM in 1995 (the "Salem Plan") with regard to snag retention or special status species and, consequently, violated the Federal Land Policy Management Act (43 U.S.C. §§ 1701–1787)("FLPMA"), Bark also alleges the environmental assessment relied on by BLM did not adequately address the direct or cumulative impacts of the Sale in violation of the National Environmental Policy Act (42 U.S.C. §§ 4321–4370)("NEPA"). Both sides filed motions for summary judgment addressing all of the claims alleged in the complaint.

The court finds that the Sale complies with the Salem guidelines for the retention of snags and consideration of the effect of the Sale on special status species as required by FLPMA, and that BLM took the requisite "hard look" at the direct and cumulative impacts of the Sale in the manner required by NEPA. Accordingly, BLM's decision to approve the Sale was not arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with the law. Bark's motion for summary judgment should be denied and BLM's motion for summary judgment should be granted,

### Preliminary Procedural Matter

On August 28, 2013, Bark filed a Notice of Supplemental Authority informing the

court that it had recently received new information from BLM which may bear on the pending summary judgment motions. The new information was a copy of a clarification of the snag, coarse wood, and green tree retention requirements in the Salem Plan which redefined the term "timber harvest" to apply only to regeneration harvests, or clear cuts, and not to the commercial thinning proposed in the Sale. The court requested briefing from both parties on whether the clarification should be considered and, if so, what effect the clarification would have on Bark's claims and the pending motions for summary judgment.

■ The parties agree that the clarification was not part of the record before the BLM at the time the relevant decision was made and, therefore, should not be considered by the court in its review of that decision. This is consistent with the Administrative Procedure Act, which is applicable to the court's review of BLM's decision, and case law construing the act. *See* 5 U.S.C. § 706 (when reviewing agency actions, "the court shall review the whole record or those parts of it cited by a party"); *Oregon Natural Desert Ass'n v. McDaniel,* 282 F.R.D. 533, 536 (D.Or.2012) ("A court must base its review of a final agency action under the Administrative Procedure Act based on the 'whole record' ... which consists of 'everything that was before the agency pertaining to the merits of its decision.'"); *Stout v. U.S. Forest Serv.,* 869 F.Supp.2d 1271, 1276 (D.Or. 2012) (the scope of review of an agency action "is limited to the administrative record before the Forest Service at the time the challenged decision was made.") Additionally, BLM offered evidence that on September 10, 2013, the clarification was withdrawn. Accordingly, the court will not consider the clarification but will limit its review to the administrative record lodged by BLM with the court on March 8, 2013.

*Background*

The Sale contemplates the commercial thinning of 201 acres of naturally regrown second-growth forest and the clearing of six acres of vegetation within existing road right-of-ways on land owned by BLM in the North Fork Clackamas River and Lower Clackamas River watersheds (the "Land") (Administrative Record ("AR") at 308). Specifically, the Land is described as scattered lands located within the boundaries of T. 4 S., R. 5 E., sections 7 and 18, W.M. in Clackamas County, Oregon (the "Project Area"), (AR at 308,) The Project Area encompasses nearly 800 acres of BLM land. (AR at 666, 826.) The Sale would affect only twenty-seven percent of the Project Area, leaving the remaining seventy-three percent in its current condition, (AR at 322.)

The Land falls within the boundaries of, and is governed by, the comprehensive Northwest Forest Plan ("Northwest Plan") implemented by the federal government in 1994 primarily to protect the then-threatened northern spotted owl. (AR at 637.) The Land is also, and more specifically, located within the Salem District and is governed by the Salem Plan, (AR at 637.)

The stated purpose of the Sale is to ensure that the Lands are managed in accordance with the Salem Plan which requires that the Land be managed to produce a sustainable supply of lumber and other commodities while providing quality habitat for organisms and species, (AR at 635, 12305.) BLM determined that the Lands are overstocked or will soon grow into overstocked conditions and, consequently, need thinning to maintain timber productivity and develop complex stand structure for desired habitats, including the development of large diameter snags. (AR at 635–37.) As a result of the Sale, ten percent or less of existing snags in all sizes over fifteen inches "may need to be

felled for safety, road construction, skid roads, cable corridors or would fall incident to logging operations." (AR at 830). Two large snags (diameters of approximately sixty inches) will definitely be lost due to road construction. (AR at 697.) The vast majority of the felled snags will be left on the forest floor as coarse woody debris ("CWD"). (AR at 339.)

*I. The Land*

The Land is composed of four distinct units. Unit 7A is a two-layered stand with a dominant understory consisting primarily of sixty year-old Douglas fir. (AR at 815.) The overstory is ninety year-old Douglas fir located in scatter clumps. (AR at 815.) The stand age ranges from forty-eight to one hundred sixty-nine years and the canopy cover is sixty-one percent. (AR at 815.) While no records or ground evidence of past management exist, the lack of snags and old-growth stumps indicate that fire was a recurrent event that prevented stands from becoming established within this unit. (AR at 815.) Unit 7B is a uniform even-age stand of sixty-four year-old Douglas fir with a stand age range from forty-five to seventy-eight years and a canopy cover of sixty-five percent. (AR at 815.) There are very few snags or down logs present in this unit. (AR at 815.) Units 18A and 18B are uniform even-age stands of sixty-eight year old Douglas fir with some scattered residual large diameter trees along the northern boundary. (AR at 815.) Fews snags are present but down wood may be found throughout these units. (AR at 815.) The young managed stands found in Units 7B, 11A and 11B represent the conditions found in a large portion of the Project Area. (AR at 815.)

The Project Area is surrounded primarily by private industrial forest lands with recent clearcuts, young plantations, and recreation areas. (AR at 663–64.) The United States Forest Service (the "Forest Service") manages a section immediately east of Units 18A and 18B. (AR at 664.) The Forest Service recently completed two timber sales in the area which involve commercial thinning and effect 2,557 acres. (AR at 666.) The Sale is the only activity contemplated in the area by BLM. (AR at 666.) Neither BLM or the Forest Service contemplate any future timber sales within the area and, based on the age of the plantations on the privately-owned land, no activity is expected on that land for the next twenty years. (AR at 666.)

*II. Airstrip Wildlife Report—2011*

BLM commissioned a Wildlife Report ("Report") to analyze the likely effects of the Sale on special status species in the Project Area. (AR at 809.) The Report is based on visits to the Project Area during the 2009 and 2010 field seasons as well as analyses of the North Fork Clackamas River and Lower Clackamas River watersheds ("Watersheds") prepared in 1996 by the Forest Service ("Analyses"). (AR at 809). The authors compiled a list of special status species documented or expected to occur on the Land from the Cascades Resource Area list based on "the proposal's geographic location, elevation, and knowledge of the habitats present gained through air photo interpretation, stand exam data, GIS information, and field reconnaissance." (AR at 809–10.) Included in the list were five species of bats: silver-haired bat; long-eared myotis; yuma myotis; long-legged myotis; and fringed myotis. (AR at 843.)

The authors determined that while the Land has an adequate supply of small snags, snags in excess of fifteen inches in diameter are currently lacking. (AR at 811–12, 817.) In fact, the Land is in a near-term (less than three decades) snag deficit. (AR at 818.) Trees that normally would have developed into large snags ap-

pear to have been removed by past timber management activity and fire. (AR at 818.) The Analyses relied on in the Report establish the existence of a snag deficit in 1996, just one year after the adoption of the Salem Plan. One analysis estimates the relevant watershed to be "approximately at 32% of biological potential currently" while the other more generally recognizes a lack of late seral structure, or a "snag lag" present when "remnant snags from the fire are in an advanced state of decay and the stands originating from the fires are still too young for snag production." (AR at 4748, 4846, 4927.)

As a result of the lack of old-growth trees and tall snags with sloughing bark, four of the five special status bat species (silver-haired bat, long-eared myotis, yuma myotis, and long-legged myotis) are considered to be present only in low numbers in the Project Area. (AR at 821.) The fifth species (the fringed myotis), which is more closely associated with habitat features not present in the Project Area, such as caves, cliffs, or abandoned mines, and is not expected to be present at all. (AR at 821.)

The retention of at least ninety percent of the large snags on the Land would effectively reserve the best existing habitat for primary excavators (woodpeckers) and secondary cavity users, including bats. (AR at 824.) The expected reduction in small snags would have limited effect of wildlife, as small snags are less important for wildlife species. (AR at 825.)

While acknowledging the lack of large snags throughout the Project Area and the expectation that the snag deficit condition will continue for three to six decades, the Report emphasizes that "as a result of thinning, growth of residual live trees would be accelerated, so that larger trees would be available sooner than without thinning to contribute additional large snags and CWD in the future stand. There could be enough material

of sufficient size to meet the [Salem Plan] guidelines for snags (40 percent maximum population densities) . . . in one to three decades." (AR at 825,) Any reduction of smaller snags as a result of the thinning would have occurred as a product of suppression mortality if the Land was left untreated. (AR at 825.)

Ultimately, the proposed thinning and accelerated development of older forests on the Land would benefit many special status species, including bats and woodpeckers. (AR at 826.) The Report notes that while bat species would be affected based on the loss of snags, "[b]at activity appears to be higher in thinned versus unthinned stands" and "[s]tructural changes in stands caused by thinning may benefit bats by creating habitat in young stands that bats are able to use more effectively." (AR at 830.)

## III. Environmental Assessment—May 2011

BLM prepared an Environment Assessment generally addressing the likely effects of the Sale on the Land and Project Area (the "Assessment"). The authors of the Assessment obtained information on the Project Area and the Land from the environmental impact statement supporting the Salem Plan, GIS data, aerial photographs and satellite imagery, BLM's Forest Operations Inventory records, resource specific field surveys, and field reconnaissance by BLM resource specialists, as well as the data compiled in the Report with regard to wildlife using similar surveys, resources, and methods. (AR at 661.) The conclusions in the Assessment were based on the understanding that the Land would not require silvicultural treatments for the next twenty years and that private industrial forest lands in and around the Project Area would be intensively managed with regeneration harvests scheduled

on commercial economic rotations occurring at fifty-to-sixty-year intervals, or possibly thirty-to-forty-year intervals. (AR at 659.)

The Assessment explained that the commercial thinning resulting from the Sale would leave the stands healthy with uniform spacing and tree size. (AR at 672.) During the first ten years, the average diameter of the forest stands would increase due to the removal of smaller and less healthy trees from the stands and the additional light allowed by the more widely-spaced tree crowns. (AR at 672.) In the following twenty years, tree crowns would continue to grow as limbs grow longer, with lower limbs remaining healthy rather than dying and self pruning. (AR at 672.) The trees damaged by the Sale, which would be limited by the terms of the Sale, would either heal, develop decay pockets, or die and become snags. (AR at 672–73.) The indirect benefits of the commercial thinning were described as increased diameter growth on the retained trees due to decreased competition for resource resulting in larger trees, an increase in crown ratios, healthier trees with larger crowns and limbs compared to trees in an overstocked stand, and a increase in high value snag habitat and CWD. (AR at 674.) Specifically, the Assessment found that "[d]ue to increased growth rates resulting from thinning, trees would reach the size suitable for high value snag habitat (15 inches diameter and larger) and CWD (20 inches diameter and larger) sooner that would be expected if the stands were not thinned." (AR at 675.)

The Assessment acknowledged that overall snag habitat does not currently meet the requirements of the Salem Plan based on the population for five woodpecker species due, in part, to the fact that the majority of the snags present on the Land are either too small or decayed and not expected to persist for very long. (AR at 693–94.) The deficit is attributed to removal of desirable snags in the 1920s by logging and firefighter efforts in Units 7B, 11A, and 11B, and stand development in Unit 7A. (AR at 694.)

While the Sale would eliminate ten percent of the snags present on the Land, including the two large diameter snags, ninety percent of the snags "would remain standing after operations, effectively retaining the majority of the best existing habitat features for primary excavators (woodpeckers) and secondary cavity uses, including song birds, bats and small mammals." (AR at 697.) However, the Land comprises only a small portion of the Project Area so, in reality, more than ninety-six percent of large snags (in excess of fifteen inches in diameter) would be retained in the Project Area. (AR at 701.)

Four species of bats, generally associated with caves, mines, buildings and cliffs, in addition to decadent trees and snags, were suspected to occur in low numbers in the Project Area. (AR at 695.) Despite the immediate loss of snags on the Land, the long-term benefits of the proposed commercial thinning would benefit snag-dependent wildlife. (AR at 697.)

The Assessment explained that:

[s]ource material for large diameter snags would be available sooner than in similar unthinned stands because it takes a large diameter live tree as source material to become a large diameter dead tree (snag or CWD). An indirect result of thinning is that retained trees grow faster in diameter than trees of the same age growing in dense stands. Snag creation due to suppression mortality would be lower than for an unthinned stand of the same initial density and age. However, suppressed trees are the smallest trees in the stand, so the snag recruitment forgone as a result of thinning from below would gen-

erally be the smaller diameters that are less valuable as habitat.

(AR at 697.) Generally stated, commercial thinning of the Land would provide better habitat for cavity nesting species than if the Sale did not occur. (AR at 705.)

Specifically with regard to the effect of the Sale on the four bureau-sensitive bat species

suspected to occur in the Project Area in low numbers, the Assessment reported that: [b]at species which use snags or large trees could be directly affected by a loss of up to ten percent of large diameter trees in unit 7A and large snags throughout the project area. Since approximately 90 percent of the large trees and snags would be retained in the project area and since only about one third of the BLM acres in the project vicinity would be treated, forest habitat features would be maintained in the area. An indirect effect of thinning is that resultant structural changes in forest stands may benefit bats by creating habitat structure in young stands that bats are able to use more effectively than structures in unthinned stands. Bat species which are associated with buildings, bridges, cliffs and caves would not be affected.

(AR at 700.)

The Assessment ultimately concluded that;

[t]hinning in the project areas, either individually or collectively, would not be expected to contribute to the need to list any Bureau Sensitive species under the Endangered Species Act because habitat for the species that [are] known to occur in the project areas would ... not be eliminated, habitat connectivity would not be changed, any habitat alteration would have only short-term negative ef-

fects, and long-term effects would be beneficial.

(AR at 703.)

## IV. Finding of No Significant Impact— May 2011

The Finding of No Significant Impact ("FONSI"), issued in conjunction with the Assessment and signed by Cindy Enstrom, the Cascades Resource Area Field Manager ("Enstrom"), on May 31, 2011, considered the impact of the Sale in the context that the proposed commercial thinning would affect less than one percent of the Watersheds. (AR at 629.) The finding that the effects of the Sale were unlikely to have any significant impact on wildlife was based on the fact that "[s]uitable habitat for all BLM Special Status Species known or likely to be present would be retained within the project area and vicinity." (AR at 630.) Further, while the loss of the two large snags would result in a change to the snag habitat, it was not considered significant because it was within the effect analyzed in the environmental impact statement prepared in support of the Salem Plan. (AR at 631.)

## V. Final Decision, Decision Rationale and Finding of No Significant Impact—January 2012

On January 11, 2012, Enstrom approved the Sale in a Final Decision, Decision Rationale and Finding of No Significant Impact ("Decision"), finding that the actions contemplated by the Sale are within the scope of proposed activities documented in the Salem Plan. (AR at 324.) In the Decision, Enstrom decreased the area to be thinned from the proposed 290 acres to 201 acres with six acres cleared for new and renovated roads. (AR at 310–11.) Enstrom found that the Sale would not result in the loss of suitable habitat for BLM Special Status species, though some habitat would be modified, and that no

species would be extirpated as a result of the planned commercial thinning. (AR at 322.)

Enstrom responded to a number of public comments received in response to the Assessment. Some of the comments contained complaints that the current number of snags on the Land are insufficient to comply with the Salem Plan and that BLM planned to fall two additional large snags. (AR at 338.) One opined that BLM should focus on preserving the few remaining large snags. (AR at 338.) Another expressed the opinion that the Assessment understated the impact of the loss of the two large snags on snag-dependent species and that such impact was not adequately analyzed or mitigated. (AR at 339.)

Enstrom found that the Assessment adequately analyzed the impacts of the thinning on current and future snag levels on the Land and in the Project Area. (AR at 339.) The Assessment acknowledged the direct results of the Sale would include the loss of snag habitat as well as a reduced number of snags created by suppression mortality, which tends to create only small diameter snags. (AR at 339.) Enstrom noted, however, the Assessment predicted that an "indirect result of thinning would be to encourage faster diameter growth on retained trees, providing potential source material for large diameter snags and CWD sooner than comparable untreated stands would. The [Assessment] demonstrates that large diameter snags and CWD provide habitat for more species than small diameter snags and CWD for a variety of reasons." (AR at 339.) Enstrom agreed with the Assessment conclusion that the environmental effects of the projected loss of snags, including the two large diameter snags, are within the effects analyzed in the Salem Plan and supporting environmental assessment. (AR at 340.) In doing so, Enstrom relied on the BLM's finding that the loss of the two

large snags will have "an impact on cavity nesters and other species that use large snags, however the CWD created will remain on the site and provide this type of habitat. The remaining large diameter/old growth tress in and adjacent to the unit would continue to provide decadence in the stand and could become large snags in the future." (AR at 340.) Enstrom specifically noted that BLM's predictions of future snag retention and development were based on "the professional experience of BLM silviculturists, wildlife biologists, foresters and contract administrators as well as professional interpretation of stand projection modeling." (AR at 339.)

The comments also expressed concern regarding the impact of the loss of snag habitat on the bat population in the Project Area. One comment expressed the opinion that the "unknown percentage" of bat habitat impacted by the loss of snags is an " 'unacceptable level of harassment' because the project falls two large snags which are a high percentage of local habitat," (AR at 341.) In response, Enstrom explained that the Sale maintains the vast majority of large tree and snag potential habitat and implements project designs features which minimize the cutting of large trees and snags. (AR at 342.) In light of the fact that less than ten percent of the large trees and snags would be cut or knocked over by logging operations, "90+ would be retained within harvest units and only about one quarter of BLM block in this area would be treated, the roughly 97.5+ percent of non-impacted large tree and snag habitat would be sufficient to maintain near-current levels of species that depend on these habitats." (AR at 342.) With regard to the potential cutting of two large snags to allow for the creation of a road, Enstrom noted that the Assessment determined the loss of the snags is within the Salem Plan and because the felled snags would be left on the

Land, would provide high value, large diameter, hard CWD, also in short supply on the Land. (AR at 342.) Enstrom also relied on the Assessment's statement that "[o]ld growth snags are only one habitat type for bats" and that "[o]ther habitats for bats include large decadent trees such as those scattered in and around the thinning units, caves, mines, cliffs, bridges and buildings," (AR at 342.)

*Legal Standard*

■ When reviewing an agency's final decision, the court's duty on summary judgment is to determine whether the evidence in the administrative record permitted the agency to make that decision as a matter of law. *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir.1985). This review is governed by the Administrative Procedure Act's arbitrary and capricious standard. 5 U.S.C. § 706(2)(A) (2012); *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1235 (9th Cir.(2001).) This standard is "highly deferential, presuming the agency action to be valid and [requires] affirming the agency action if a reasonable basis exists for its decision." *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir.2006) (quoting *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir.2000)).

■ The court may set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To determine whether an agency decision is arbitrary and capricious, the court should "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). After considering the relevant factors, the agency must articulate a satisfactory explanation for its action, including a rational connection between the facts found and the agency's conclusions. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1193 (9th Cir.2008); *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1145 (9th Cir.2007) (citation omitted).

■ An arbitrary and capricious finding is necessary if the agency "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a different in view or the product of agency expertise." *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir.2010). Under the arbitrary and capricious standard of review, an agency's decision "need only be reasonable, not the best or most reasonable, decision." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir.2010).

■ The court must be "at its most deferential" when reviewing an agency's scientific determinations under the arbitrary and capricious standard. *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). Even if an agency decision is based on "admittedly weak best available science," the court is not allowed to "substitute [its] judgment for that of the agency." *ALCOA v. BPA*, 175 F.3d 1156, 1160–61 (9th Cir.1999). Courts are not to "act as a panel of scientists, instructing the agency, choosing among scientific studies, and ordering the agency to explain every possible scientific uncertainty." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir.2008); *abrogated on other grounds by Winter v. Natural Res. Def. Council*, 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (internal quotation marks and brackets omitted). Ultimately, review under the arbitrary and capricious standard

is narrow, and the court may not substitute its judgment for the judgment of the agency. *McNair,* 629 F.3d at 1070.

## Discussion

### I. FLPMA Claims

In its first two claims for relief, Bark alleges that BLM violated FLPMA by failing to comply with the requirements of the Salem Plan. In its First Claim for Relief, Bark asserts that the planned removal of snags on the Land does not meet the Salem Plan requirement that snags within a timber harvest unit be retained at levels sufficient to support cavity-nesting species at forty percent of population levels. Because the snags presently on the Land already fall below this forty percent standard, Bark contends that any removal of snags from the Land would further this deficiency and violate the express terms of the Salem Plan. The Second Claim for Relief is based on allegations that BLM failed to properly consider the impact of the loss of snags on bat species afforded special status as required under the Salem Plan. Bark asserts that BLM's failure to follow the guidelines of the Salem Plan was arbitrary and capricious and not in accordance with the FLPMA.

### A. FLPMA

In the mid–1970's, Congress addressed concerns about the management of publicly-owned land and its belief that it should "be managed in a manner that will protect the quality of scientific, scenic, historical, environmental, air and atmospheric, water resource, and archeological values. 43 U.S.C. § 1701(a)(8). To that end, Congress enacted FLPMA to "provide for the management, development, and enhancement of the public lands" and ensure that the present and future use of public lands be "protected through a land use planning process." Pub. L. 94–579; 43 U.S.C. § 1701(a)(2).

"FLPMA requires that the BLM, under the Secretary of the Interior, 'develop, maintain, and when appropriate, revise land use plans' to ensure that land management be conducted 'on the basis of multiple use and sustained yield.'" *Oregon Natural Res. Council Fund v. Brong,* 492 F.3d 1120, 1125 (9th Cir.2007) (quoting 43 U.S.C. §§ 1701(a)(7), 1712(s)). To comply with this requirement, the Secretary creates land use plans at the district level to guide development and maintenance of public land in specifically defined areas. "Generally, a land use plan describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps." *Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55, 59, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004) (citing 43 C.F.R. § 1601.0–5(k)). Once a land use plan is developed, "[a]ll future resource management authorizations and actions ... shall conform to the approved plan." 43 C.F.R. § 1610.5–3(a). Under FLPMA, BLM has "a great deal of discretion in deciding how to achieve" compliance with a land use plan. *Norton,* 542 U.S. at 66, 124 S.Ct. 2373.

### B. The Northwest Plan

The Northwest Plan is the primary land use plan applicable to the Land. The Northwest Plan is "the product of extensive litigation and political controversy surrounding the health of the old growth forest of the Pacific Northwest," *Conservation Northwest v. Sherman,* 715 F.3d 1181, 1183 (2013). The Northwest Plan, which applies to nearly 25 million acres of federal land located between San Francisco and the Canadian border, "is intended to serve the twin goals of protecting the long-term ecological health of the forests and providing for sustainable timber production, and so requires a 'balancing act between commercial use and conservation.'" *Id.* (quoting *Conservation North-*

*west v. Rey,* 674 F.Supp.2d 1232, 1238 (W.D.Wash.2009)). The federal lands within the Northwest Plan boundaries are divided into land allocations identified as Reserves, Matrix, or Adaptive Management areas. *Rey,* 674 F.Supp.2d at 1238. The Matrix, which covers four million acres, is where most commercial logging occurs. *Id.* The Land falls more specifically within the boundaries of the Salem Plan, which specifically incorporates the provisions of the Northwest Plan.

## C. The Salem Plan

The Salem Plan incorporates the land allocations identified in the Northwest Plan and creates standards and guidelines for each land allocation category. The Project Area is divided almost equally between the Matrix and Riparian Reserve allocations. (AR at 665.) The Land falls primarily within the Matrix Land Use Area which comprises the General Forest Management Area and Connectivity/Diversity Blocks ("Matrix"). (AR 308, 12305).[1]

The relevant objectives[2] for land within the Matrix identified in the Salem Plan are to:

> Produce a sustainable supply of timber and other forest commodities to provide jobs and contribute to community stability.
>
> \* \* \*
>
> Provide habitat for a variety of organisms associate with both late-successional and younger forests.
>
> Provide for important ecological functions such as dispersal of organisms ... and maintenance of ecologically valuable structural components such as down logs, snags, and large trees.
>
> Provide early successional habitat.

(AR at 12305.) The Salem Plan specifically directs that timber harvest activities within the Matrix retain snags "at levels sufficient to support species of cavity-nesting birds at 40 percent of potential population levels" and "[m]eet the 40 percent minimum throughout the Matrix with per acre requirements met on average areas no larger than 40 acres," (AR at 12306.) Managers are also directed to "retain green trees for snag recruitment in harvest units where there is an identified near-term (less that three decades) snag deficit." (AR at 12306.)

The Salem Plan also provides standards and guidelines with regard to wildlife, in general, and special status species, in particular, which are also relevant to the Matrix. The general objective of the Salem Plan with respect to wildlife is to "enhance and maintain biological diversity and ecosystem health in order to contribute to healthy wildlife populations." (AR at 12309.) Managers are directed to engage in watershed analysis to resolve concerns with regard to wildlife habitat and, where appropriate, identify wildlife habitat enhancement opportunities. (AR at 12309). "Types of enhancement opportunities include providing downed wood, gating and/or obliterating roads, seeding elk forage, creating permanent elk forage areas, creating snags, and restoring wetlands." (AR at 12309.) The wildlife section of the Salem Plan incorporates the snag-retention requirements first identified in the Matrix management directives. (AR at 12310.)

All of the land allocations are designed, at least in part, to benefit species identified as "special status" species by BLM.

---

1. Three acres of the Land proposed for commercial thinning is located in the Riparian Reserve Land Use Allocation. (AR at 308.)

2. All of the Land within the Matrix is within the General Forest Management Area. (AR at 308.) Accordingly, standards and guidelines applicable to Connectivity and Diversity Blocks are not relevant.

(AR at 12313.) When a special status species is suspected, or known, to occur in land governed by the Salem Plan, BLM is required to engage in specific conduct to determine how a proposed action may affect the species. (AR at 12314.) The Salem Plan requires that BLM "[r]eview all proposed actions to determine whether or not special status species occupy or use affected areas or if habitat for such species is affected." (AR at 12314.) BLM must "[c]onduct field surveys according to protocols and other established procedures" the intensity of which will vary depending on the number and timing of previous surveys, the comprehensiveness of those previous surveys, and the likelihood of potential habitat for the special status species. (AR at 12314.) BLM must also identify and clearly describe the impacts of the proposed action on a special status species in an environmental analysis and retain "habitat essential for the survival or recovery of listed and proposed species." (AR at 12314.) If the proposed action may detrimentally affect the species or their habitat, BLM is directed to confer with related organizations, such as the United States Fish and Wildlife Service, National Marine Fisheries Service or the State of Oregon, for assistance in determining the appropriate response, such as modifying, relocating or abandoning the proposed action. (AR at 12314.)

### 1. Snag Retention Requirements

Bark argues that because the Land does not meet the forty-percent standard set forth in the Salem Plan, BLM is prevented from felling any snags on the Land until this standard is met. Accordingly, the Sale, which involves the felling up to ten percent of the snags currently on the Land, and specifically, two large diameter snags in Section 7B, violates the Salem Plan and FLPMA. BLM concedes that the Land does not meet the minimum snag requirement but asserts that the Sale still complies with the guidelines applicable to timber harvests or other silvicultural activities occurring on Matrix land as set forth in the Salem Plan.

BLM contends that the Salem Plan authorizes commercial thinning on Matrix land that currently has a snag deficit. BLM specifically argues that the general management actions/directions for the Matrix require that timber harvest activities provide a renewable supply of large down logs across the landscape to meet the needs of species and ecological functions and the retention of green trees and snags throughout the area. In addition to the minimum snag-retention requirement, the Salem Plan requires the retention of six to eight green conifer trees per acre in regeneration harvest units, In timber harvest units with an identified near-term (less than three decades) snag deficit, which is the status of the Land, additional green trees must be retained for snag recruitment. BLM asserts the latter requirement makes clear the Salem Plan contemplates, and authorizes, timber harvest activities occurring during an identified snag deficit when coupled with remedial measures to ensure the generation of snags in the future. The court finds this to be a reasonable construction of the Salem Plan.

This construction is supported by the key findings and recommendations in the Analyses completed just after the adoption of the Salem Plan. The majority of the Land falls within the North Fork watershed. (AR at 811). The North Fork analysis identified a lack of both large diameter snags and CWD of all sizes and decomposition classes in this watershed but recommended "thinning mid seral stands to promote tree growth for long-term future large snag recruitment" and girdling standing trees to create down woody debris throughout the watershed. (AR at 812.) The analysis for the rest of

the Land, located in the Lower Clackamas River watershed, also recommends maintaining forest health by treating early and mid-seral stands, (AR at 812.) Most of the Land consists of mid-seral stands. (AR at 811.) The proposed commercial thinning clearly conforms with the recommendations in the Analyses.

Additionally, the existence of a snag deficit on the Land identified in the Analyses, which was issued in 1996, makes it clear that the Land was in snag-deficit at the time the Salem Plan was adopted in 1995, In fact, one analysis estimates the Land to be below the Salem Plan's forty percent population level standard, estimating that the relevant watershed was only "at 32 % of biological potential currently." (AR at 4927.) Accordingly, it appears that since the inception of the Salem Plan, the Land has fallen below the forty percent standard. Based on the science introduced by the BLM, the commercial thinning contemplated by the Sale will move the Land toward compliance with the Salem Plan's forty percent standard sooner than if the Land is left alone. As such, the Sale falls within BLM's discretion to implement the Salem Plan to reach the goals set forth therein.

The Sale may result in the felling of up to ten percent of snags larger than fifteen inches diameter and will result in the felling of two large-diameter snags. The Assessment indicates that the ninety percent of snags remaining after the Sale represents the "majority of the best existing habitat features" for cavity nesting species. (AR at 697.) Additionally, source material for large diameter snags would be available sooner after commercial thinning than in unthinned stands in light of the faster growth of the trees remaining after thinning. All of the felled snags would be retained on site as CWD, thereby increasing the number of down logs available for dead wood dependent species across the

Land, a change within the effects contemplated by the environmental impact statement supporting the Salem Plan. (AR at 631). The Assessment concludes, based on the "professional experience of BLM silviculturists, wildlife biologists, foresters and contract administrators, as well as professional interpretation of stand projection modeling" that the harvest activities generated by the Sale will "increase habitat diversity on a landscape level in the vicinity of the project area by accelerating growth of trees ... providing large diameter trees available for recruitment of large diameter snags and CWD for dead wood dependent species in the project area" and that while the felling of the two large snags will reduce available large snag habitat, currently lacking in the area, the snags will be converted to large diameter CWD habitat, which also does not currently meet Salem Plan standards in the area. (AR at 721.)

The relevant science and literature establishes that leaving the Land alone will have a detrimental effect on the creation of desirable snags. If left unthinned, the current overcrowded stands would not create sufficient large diameter snags to meet the requirements of the Salem Plan for twenty-to-forty years while the commercially thinned stands would be expected to eliminate the snag and CWD deficit ten years earlier (within one to three decades). (AR at 825, 836.)

In the Decision, Enstrom explained, while responding to comments received from the public expressing concern over the removal of snags, that while the Assessment "clearly shows that current levels of snags and CWD are lower than desired levels, ... an indirect result of thinning would be to encourage faster diameter growth on retained trees, providing potential source material for large diameter snags and CWD sooner than compara-

ble untreated stands would." (AR at 339.) The recruitment of larger snags is particularly beneficial in light of the fact that "large diameter snags and CWD provide habitat for more species than small diameter snags and CWD." (AR at 339.) Specifically with regard to the felling of the two large-diameter snags in Section 7B, the loss would immediately "impact cavity nesters and other species that use large snags, however, the CWD created will remain on the site and provide this type of habitat." (AR at 340.) Additionally, the "remaining large diameter/old growth trees in and adjacent to the unit would continue to provide decadence in the stand and could become large snags in the future." (AR at 340.)

The Sale will result in the loss of some snag habitat. The conversion of the snags to CWD, both of which are currently under represented on the Land, and the resulting acceleration of large diameter trees available for the recruitment of large diameter snags or CWD, are consistent with the general management direction for Matrix land as set forth in the Salem Plan. The Land is currently below the snag retention standard. This will not change if the timber activities identified in the Sale do not occur. The Land will remain in a snag deficit and that deficit, according to the scientific evidence, is expected to last for twenty-to-forty years. However, if the Sale goes forward and the commercial thinning occurs, the Land will still remain in a snag deficit but the CWD deficit will be decreased and the accelerated growth of the trees generated by the commercial thinning will result in the amelioration of the snag and CWD deficit within ten-to-thirty years, ten years earlier than if the Sale did not occur. It is unreasonable to reject the benefits expected to inure to the Land as a result of the Sale solely because the snag deficit will continue immediately after the commercial thinning is completed. The BLM's interpretation of the Sa-

lem Plan that the Land is to be managed to ensure its long-term compliance with the Salem Plan's general objectives is reasonable, not arbitrary and capricious.

Bark relies heavily on *Or. Natural Res. Council v. Brong,* 492 F.3d 1120 (9th Cir. 2007), in support of its argument that the "some-is-enough" mentality with regard to snags is arbitrary and capricious. In *Brong,* BLM proposed removing a significant number of snags during salvage logging operations in acreage affected by wildfires. *Id.* at 1128. The land was located within Late–Successional Reserves, identified in the Northwest Plan as an area where stand management activities, such as logging, are prohibited except in narrow circumstances, such as following a wildfire. *Id.* at 1126. The Northwest Plan provides that, in these narrow circumstances, "management should focus on retaining snags that are likely to persist until late-successional conditions have developed and the new stand is again producing large snags." *Id.* at 1128. The Ninth Circuit found that BLM decision to remove virtually all of the snags was not rational because BLM "neglects to explain why the snag removal it does authorize, which undisputedly harms late-successional habitat in the short term, will somehow maintain overall habitat suitably now or in the future, as expressly required by the NFP." *Id.* at 1131. *Brong* is easily distinguished from the case at hand.

The Land is located in the Matrix which allows stand management activities, such as logging. In fact, an objective for Matrix land in both the Northwest Plan and the Salem Plan is to provide a sustainable supply of timber and other forest commodities, in contrast with Late–Successional Reserves on which logging is prohibited except in narrow circumstances. The Sale contemplates the removal of up to ten percent of snags, leaving ninety percent on

the Land, while the project in *Brong* planned for the removal of virtually all snags and relied solely on the snag habitat in the surrounding areas to justify its actions. Finally, the court in *Brong* found that BLM failed to explain how the snag removal would maintain suitable habitat now or in the future. Here, BLM has adequately explained that the Sale, and resulting snag reduction, will ultimately result in the generation of desirable snag habitat and likely meet the Salem Plan requirements ten years sooner than if the Sale did not occur. Accordingly, the teachings of *Brong* are not relevant to the issues currently before this court.

■ Viewing the general purpose of the Salem Plan and the Matrix management guidelines as a whole, the court finds BLM did not act arbitrarily or capriciously in finding that the Sale complies with the requirements of the Salem Plan. In fact, the decision to go forward with the commercial thinning of the Land despite current snag deficit satisfies the reasonable standard in light of the resulting benefits to the Land, based on the accelerated growth in the remaining trees and the resulting decrease in the time needed to meet the Salem Plan's snag requirements, as well as the increase in CWD, providing additional habitat for cavity nesting species. Additionally, the BLM's decision is in accordance with the twin goals of the Northwest Plan and the Salem Plan to protect the long-term ecological health of the forest and provide for sustainable timber production and represents an appropriate balancing of these goals.

### 2. Special Status Species

In its Second Claim for Relief, Bark alleges that BLM failed to address how the loss of high value snag habitat will impact sensitive species, specifically bats.

Bark argues that the generically descriptive statements found in the Report and the Assessment that the Sale will not significantly impact special status species bats are insufficient and that BLM must answer more specific questions, such as how will the loss of more snags man area already denuded of large snags impact snag-dependent species, is there any alternative high value habitat near the Land, or what will the impact of the Sale be on species ability to persist while the Land remain in a snag-deficit condition. BLM contends that the Reports and the Assessment contain all of the required data and analysis and that the expert opinions that the Sale will not adversely affect special status species is entitled to a high level of deference.

The Report indicates that five bats species identified as special status species are suspected to occur on the Land.[3] (AR at 821.) Because of the scarcity of old-growth and tall snags with sloughing bark in the Project Area and the fact that many bat species prefer older forests, the special status bat species are likely to be present only in low numbers. (AR at 821.) The Report explains that the retention of at least ninety percent of existing snags in all sizes over fifteen inches in diameter would effectively retain the "best existing habitat features for primary excavators (woodpeckers), and secondary cavity uses, such as songbirds, bats and small mammals." (AR at 824–25.) The majority of the snag habitat felled would be smaller diameter/taller snags that are less important for wildlife species. (AR at 825.) The lost habitat resulting from the felling of the two large diameter snags would be offset to some degree by the creation of CWD on the site. (AR at 825.) Additionally, the commercial thinning contemplated in the

---

**3.** These bat species are also associated with caves, mines, bridges, buildings, and cliffs, none of which are present on the Land. (AR at 695, 821.)

Sale could accelerate the growth of the remaining trees providing enough material to meet snag guidelines and provide adequate snag habitat for special status species within one-to-three decades. (AR at 825.)

The Report, while acknowledging that negative effects of the loss of snag habitat in the immediate future, ultimately concludes that the "long term benefits of thinning a stand could outweigh the negative effects of losing the short term recruitment of large amounts of small dead wood to snag associated species for the purpose of foraging." (AR at 826.) The Report further explains that the because only a small portion of land within the Project Area will be thinned "[t]here should be sufficient untreated areas to provide any benefit that may be gleaned from suppression mortality to snag associated species, yet providing high growth rates in thinned areas to provide for future recruitment of large diameter snags." (AR at 826.)

> The Assessment specifically found that: Bat species which use snags or large trees could be directly affected by a loss of up to ten percent of large diameter trees in unit 7A and large snags throughout the project area. Since approximately 90 percent of the large trees and snags would be retained in the project area and since only about one third of the BLM acres in the project vicinity would be treated, forest habitat features would be maintained in the area. An indirect effect of thinning is that resulting structural changes in forest stands may benefit bats by creating habitat structure in young stands that bats are able to use more effectively than structures in unthinned stands.

(AR at 700.)

Based on the information found in the Report and the Assessment, BLM concluded that "[s]uitable habitat for all BLM Special Status species known or likely to

be present would be retained within the project area and vicinity" noting that when considering the Project Area as a whole, approximately ninety-six percent of large snags would remain intact. (AR at 630–31.) Similarly, Enstrom finds in the Decision that, "[n]o suitable habitat for BLM Special Status species known or likely to be present would be lost, though some habitat will be modified." (AR at 322.) Enstrom further explained, in response to public comments, that "the roughly 97.5 + percent of non-impacted large tree and snag habitat would be sufficient to maintain near-current levels of species that depend on these habitats," that "[o]ld growth snags are only one habitat type for bats," and that "[o]ther habitats for bats include large decadent trees such as those scattered in and around the thinning units, caves, mines, cliffs, bridges and buildings." (AR at 342.)

BLM scientists clearly and consistently opined that the low number of special status bat species suspected to be on the Land in low numbers due to the existing absence of desirable snag habitat on the Land would not be detrimentally affected by the Sale based on the limited loss of snag habitat on the Land and the presence of adequate snag habitat in the Project Area and the Watersheds. The questions which Bark argues must be answered have, in fact, been answered. The loss of more snags on land already denuded of large snags will have little effect on the special status bat species as such species are present only in low numbers based on the absence of snag habitat on the Land. The Report and the Assessment explain that habitat sufficient to support the low number of bats suspected to occur on the Land is present in the Project Area and Watersheds. The Sale will result in creation of high-value snag habitat at least ten years earlier than if the Sale did not occur thereby increasing the species ability

to persist on the Land while it remains in a snag-deficit condition.

■ BLM has identified and clearly described the impacts of the Sale on special status bat species suspected to be present in low numbers on the Land. BLM scientists have concluded that the Sale will not detrimentally impact these few bats based on presence of adequate snag habitat on the Land and in the Project Area. The findings are supported by field reconnaissance performed by BLM resource specialists, prior analyses of the Land, the Project Area and the Watersheds, and scientific literature, and are supported by the record. Bark has failed to identify any contradictions between the findings and the record or demonstrate that the record lacks evidence to support the conclusions. The court finds that BLM's consideration of the impact of the Sale on special status bat species occupying the Land and determination that the species would not be adversely impacted complied with the guidelines of the Salem Plan. BLM's decision to approve the Sale was reasonable, not arbitrary or capricious, and did not violate FLPMA. Accordingly, BLM is entitled to summary judgment on Bark's First and Second Claims for Relief.

## II. NEPA Claims

Bark contends the Assessment and FONSI prepared with regard to the Sale is arbitrary and capricious. Specifically, Bark argues that BLM did not take the required "hard look" at the at either the direct or cumulative impacts of the Sale on snag-dependent species.

■ NEPA requires federal agencies "to the fullest extent possible," to prepare a "detailed statement on ... the environmental impact" of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i) (2012); see also 40 C.F.R. § 1500.2. The purpose of NEPA is two-fold: (1) to ensure the agency "will have available, and will carefully consider, detailed information concerning significant environmental impacts" of its decisions; and (2) to guarantee that this information will be available to the public. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). NEPA does not mandate particular results, but simply proscribes the necessary process. Sierra Club v. Espy, 38 F.3d 792, 796 (5th Cir.1994). Because NEPA is essentially a procedural statute, judicial "review of agency decisionmaking under NEPA is limited to the question of whether the agency took a 'hard look' at the proposed action as required by a strict reading of NEPA's procedural requirements." Bering Strait Citizens for Resp. Dev. v. U.S. Army Corps of Eng'rs, 524 F.3d 938, 947 (9th Cir.2008); Northcoast Envtl. Ctr. v. Glickman, 136 F.3d 660, 665 (9th Cir.1998).

An agency's first step to ensure compliance with NEPA is to prepare an environmental assessment. 40 C.F.R. § 1501.4(b). An environmental assessment is a concise public document that briefly describes the need for the proposal, and examines the environmental impacts of the proposed action and the alternatives. 40 C.F.R. § 1508.9. If the agency makes a finding of no significant impact after adequately analyzing the proposed action in the environmental assessment, then a more comprehensive environmental impact statement is not required. Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1356 (9th Cir.1994).

■ Whether a proposed action "may have a significant effect on the environment," depends on the "context and intensity" of the environmental impacts. Ctr. for Biological Diversity, 538 F.3d at 1220 (citing Nat'l Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722, 731 (9th Cir.

2001)). A number of factors should be considered, including: the beneficial and adverse impacts of the action; unique characteristics of the geographic area; the degree of uncertainty associated with the impacts; the degree of controversy surrounding the project; cumulative effects; and whether the action "may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973." 40 C.F.R. 1508.27. An environmental impact statement may be required if one of those factors is met. *Ctr. for Biological Diversity*, 538 F.3d at 1220; *see also Babbitt*, 241 F.3d at 731 (either the "degree of uncertainty manifested" or the "degree of controversy generated ... may be sufficient to require preparation of an [environmental impact statement] in appropriate circumstances").

■■■■ "If an agency decides not to prepare an environmental impact statement, it must supply a convincing statement of reasons to explain why a project's impacts are insignificant. The statement of reasons is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project." *Ctr. for Biological Diversity*, 538 F.3d at 1220 (quotations marks and citation omitted.) In evaluating the sufficiency of an environmental assessment, courts determine whether the agency "adequately considered and elaborated the possible consequences of the proposed agency action when concluding that it will have no significant impact on the environment, and whether its determination that no [environmental impact statement] is required is a reasonable conclusion." *Id.* at 1215. An environmental assessment "need not conform to all the requirements of an [environmental impact statement]," but it must be "sufficient to establish the reasonableness" of the agency's decision not to prepare an environmental impact statement. *Id.* (citing *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1178 (9th Cir.1982)).

### A. Direct Impacts

■■■■ Bark complains about BLM's statement that the felling of the two large snags will reduce high-value habitat for primary excavators and secondary cavity users in the Watersheds by an "unknown percentage," arguing that it represents inadequate data and is a conclusory generalization. However, the record establishes that the two large snags are part of the ten percent of snag habitat on the Land put at risk by the Sale, the Land is only seventy-three percent of the Project Area, and more than ninety-six percent of snag habitat will remain in the Project Area. This information, when viewed in light of the fact that the Land covers far less than even one percent of the Watersheds, makes clear that the "unknown percentage" of snag habitat lost in the Watersheds is a very small percentage, consistent with the ultimate finding that "[s]uitable habitat for all BLM Special Status species known or likely to be present would be retained within the project area and vicinity." (AR at 630.) Additionally, the two large snags will be left on the Land to create CWD, habitat which is also used by primary excavators and secondary cavity users, further decreasing the percent of high-value habitat lost as a result of the felling of the two large snags.

Bark also complains that the information in the Assessment contradicts Enstrom's conclusion that "no suitable habitat will be lost, though some may be modified," (AR at 322.) While Enstrom's statement may contradict the statement that some snag habitat will be lost due to the Sale, it is consistent with the explanation that the felled snags will be left on the Land and will provide alternative suitable habitat for the species. BLM has determined that

the felling of the snags will not result in reduction of suitable habitat but, instead, will result in the conversion of such habitat from snags to CWD.

BLM determined that the direct impact of the loss of a small amount of snag habitat to snag-dependent species was not significant in light of the small population of snag-dependent species currently residing on the already snag-deficient land, the minor amount of snags that would be removed from the Land, the presence of high-value snag habitat in the Project Area and the Watersheds, and the conversion of snags to CWD, providing alternative habitat for primary excavators and secondary cavity users. In doing so, BLM took a "hard look" at the expected direct impacts of the Sale on special status species suspected to be present on the Land in conformance with NEPA requirements.

### B. Cumulative Impacts

 Bark argues that BLM did not adequately consider the cumulative impacts of the Sale based on BLM's failure to consider the use of the land surrounding the affected area. NEPA requires the BLM to consider the cumulative impacts of the Sale and other activities in the vicinity of the Sale. A "cumulative impact" is defined as:

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or persons undertakes such other actions, Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. "Consideration of cumulative impacts requires 'some quantified or detailed information; ... [g]eneral statements about "possible" effects and "some risk" do not constitute a "hard look"

absent a justification regarding why more definitive information could not be provided.'" *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir.2002) (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379–80 (9th Cir.1998)). "A cumulative impacts analysis must be more than perfunctory; it must provide a 'useful analysis of the cumulative impacts of the past, present, and future projects.'" *Kern*, 284 F.3d at 1075 (quoting *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 810 (9th Cir. 1999)).

The Assessment explains that the area surrounding the Land in the Watersheds is owned by BLM, the Forest Service, and private landowners. (AR at 663–64.) The privately-owned timber land "will be intensively managed with regeneration harvests scheduled on commercial economic rotations occurring at 50–60 year intervals" with a possible reduction to thirty to forty years intervals for some landowners. (AR at 659.) Most privately-owned land near the Land has been recently harvested or is in young (less than twenty years) plantations. (AR at 666.) Because timber stands must be at least forty years old to be considered for timber harvest, BLM has observed no indicators of imminent harvest operations on the privately-owned land. (AR at 666.) The privately-owned land is also used for recreation and storage. (A.R. at 664.)

The Forest Service is currently engaged in the commercial thinning of 2,557 acres in the Watersheds. (AR at 666.) The Sale is the only BLM activity currently in process in the Watersheds. Neither the Forest Service nor BLM are planning on additional timber harvest activities in the future. (AR at 666.)

The Assessment concludes that "[n]o cumulative effects are expected with regard to stand structure and development be-

cause the proposed thinning would maintain a forest setting in the same age classes as before thinning." (AR at 675.) Specifically with regard to the cumulative effects on wildlife, the Assessment revealed that "[t]hinning in the project areas, either individually or collectively, would not be expected to contribute to the need to list an Bureau Sensitive species under the Endangered Species Act (BLM 6840) because habitat for the species that is known to occur in the project areas would not be eliminated, habitat connectivity would not be changed, any habitat alteration would have only short-term negative effects, and long-term effects would be beneficial." (AR at 703.) Elsewhere, the Assessment indicates more generally that no cumulative effects are expected with regard to special status species as "suitable habitat for SSS will remain in the proposed thinning area because thinning will not remove such habitat, and suitable habitat for SSS will remain undisturbed adjacent to the proposed thinning areas." (AR at 675.)

Bark has no complaints with regard to the description of the surrounding area in the Assessment. Bark does argue about the absence of meaningful analysis of the impacts of the Sale in the context of the heavily managed surrounding landscape, specifically with regard to snags and special status species. Bark bases this argument on its assumption that the heavily managed surrounding lands have virtually no high-quality snag habitat.

Bark provides no support for this assumption. While the record establishes that the Watersheds are lacking in large diameter snags and CWD, the court has not found, and Bark does not cite to, any evidence in the record that virtually all of the large diameter snags in the Watersheds have been downed. "Lacking" does not equate to virtually nonexistent,

The Assessment makes clear that no future projects in the Watersheds are expected. The Assessment was based on the current status of the Land and the area surrounding it, which inherently included past actions, such as harvest activities on nearby privately-owned land. Accordingly, the Assessment considered the cumulative effects of this activity in determining that sufficient high-value snag habitat exists in the Project Area to offset the effect of the loss of similar habitat on the low number of special status species suspected to be present on the Land. The final question is whether the BLM adequately considered the cumulative impact of the current commercial thinning of just over 2,500 acres in the Watersheds and the Sale on snags and special status species.

The Assessment identifies the names of the Forest Service timber sales and the acreage involved in the each sale. The Assessment further explains the timber sales contemplate commercial thinning and the land involved is within the Watersheds. The Assessment does not discuss the how the snag habitat will be affected by the timber sales or specifically where the acreage is located with regard to the Land. In some circumstances, this information would be necessary to adequately address the cumulative effects of the timber sales and the Sale. However, because the Land is a small portion of a larger area owned by BLM, the timber sales effect a very small portion of the Watersheds, and special status species are expected to be present on the Land only in low numbers, an adequate analysis of the cumulative impacts may be made without this additional information.

The Assessment makes clear that the Sale will fell, at most, less than four percent of high-value snag habitat in the Project Area and that the remaining high-value snag habitat in the Project Area will

be sufficient to support any special status species present on the Land. Accordingly, the current activities in the Watersheds will not have a discernable impact on these species. Additionally, the fact that the timber sales represent less than one percent of the 32,334 acres in the Watersheds supports the conclusion that any high-value snag habitat lost in the Watersheds as a result of the commercial thinning proposed by the timber sales will not result in a cumulative impact to snag habitat or special status species.

██ The record demonstrates that BLM considered the cumulative effects of activity in areas around the Land. The court finds that the Assessment contains a reasonably thorough discussion of relevant past, present, and future activities in the Project Area and the Watersheds with regard to the cumulative impact of the Sale. BLM did not violate NEPA by failing to adequately consider the direct or cumulative impacts of the Sale. BLM is entitled to summary judgment on Bark's Third Claim for Relief.

### Conclusion

Bark's motion (# 18) for summary judgment should be DENIED and BLM's motion (# 30) for summary judgment should be GRANTED. A judgment dismissing this action with prejudice should be entered.

### Scheduling Order

The Findings and Recommendation will be referred to a district judge for review. Objections, if any, are due **January 3, 2014.** If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 18th day of December, 2013.